# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0095-21

M.R.,

    Plaintiff-Appellant,

v.

M.D.,

    Defendant-Respondent.

_____

           Submitted May 31, 2022 – Decided July 13, 2022

           Before Judges Rothstadt and Mayer.

           On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-2358-21.

           Legal Services of New Jersey, attorneys for appellant (Shoshana Gross, of counsel and on the brief).

           Respondent has not filed a brief.

PER CURIAM

Plaintiff M.R.[1] appeals from the Family Part's August 16, 2021 dismissal of her complaint and temporary restraining order (TRO) that were filed against defendant M.D. under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. After a trial, the court dismissed the matter after concluding that while defendant committed the predicate acts of assault, N.J.S.A. 2C:12-1(a), by breaking plaintiff's fingers, and harassment, N.J.S.A. 2C:33-4, plaintiff failed to establish that there was a need for a final restraining order (FRO) for her continued protection from defendant.

On appeal, plaintiff argues that the trial court's determination was inconsistent with the analysis required under Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006), and it failed to consider the factors set forth in N.J.S.A. 2C:25-29(a)(1) to (6). For the reasons stated in this opinion, we reverse and remand this matter for the entry of an FRO in favor of plaintiff.

I.

The facts developed at the final hearing are summarized as follows. The parties were previously in a dating relationship and shared an apartment together. The apartment was upstairs from another apartment where defendant's

---

[1] We use initials for the parties to protect the identity of the victim, consistent with Rule 1:38-3(d)(10).

brother lived. They have one child, a daughter who is now fourteen months old. Ultimately, they broke up because plaintiff found out, before their child was born, that defendant started a relationship with another woman.

On June 16, 2021, plaintiff filed her complaint and secured a TRO. In her complaint, she alleged that on that day, defendant committed the predicate act of harassment. Specifically, she stated that after defendant moved out of their shared apartment on June 1, he began to appear at her residence unannounced and gained entry without her permission using his key to the apartment. She also alleged that after letting himself in, he screamed at her, became aggressive, and "charged toward [her] . . . while she was holding the baby." Her complaint also alleged a prior incident of domestic violence. Specifically, she stated "defendant broke [her] hand in the past (unreported)."

The next day, defendant filed his own complaint and secured a TRO against plaintiff. In his complaint, he alleged the predicate act of criminal mischief, N.J.S.A. 2C:17-3, and harassment. He also described two incidents of alleged domestic violence which occurred on June 14 and June 16, 2021, and that during the course one of the incidents, plaintiff damaged his cell phone.

After being served with defendant's complaint, plaintiff amended her previously filed complaint on June 30, 2021, to specify additional incidents of

domestic violence. In her amended complaint, she alleged the predicate acts of assault and harassment. She also added that on May 1, defendant "twisted" her fingers until two of them broke, and that on May 16, he "was drunk[,] accused [plaintiff] of stealing his wallet[,] . . . screaming [and] throwing things, [and] flipp[ing] [her] mattress over."

Plaintiff also amended her complaint to add previous acts of domestic violence that occurred approximately during "the last week of April." At that time, she alleged that she had to "hid[e] behind a bedroom door to protect [herself] from defendant [and] he knowingly opened it so it would hit [her]." According to plaintiff, "that happened more than once throughout the relationship [and] defendant subjected [her] to verbal [and] emotional abuse."

The matter came before the court for a trial on August 16, 2021. At the trial, plaintiff was represented by counsel and defendant appeared pro se. The parties were the only witnesses to testify.

Plaintiff testified first. Under questioning by the trial court, she described the incident that occurred on May 1. On that day, defendant failed to come home[2] to assist her with their baby, and when he arrived late at night, she was

---

[2]  Although by that time defendant was seeing another woman, he continued to reside in the parties' residence until June 1.

"extremely upset." When he finally came home, she was feeding their then two-week-old baby. Defendant requested that he be allowed to feed the baby and plaintiff gave him the child as well as her bottle.

When plaintiff started to explain why she was upset, defendant began to "yel[l] very loudly, calling [her] names." At that point she asked for the baby back so she could "go feed her in peace." When she attempted to take the bottle out of defendant's hand, "he dropped the bottle . . . and with the same hand grabbed three of [her] fingers and twisted" until her fingers broke. Plaintiff made it clear that there was "absolutely no fight" as she was in no condition to attempt to fight with defendant physically as she had just had two surgeries. Plaintiff immediately had her adult daughter come to the apartment to watch the baby, and had a friend take her to the hospital, where she was diagnosed with and treated for broken fingers.

The trial court then proceeded to question plaintiff about the incident that occurred on June 14, which plaintiff stated was the first time that the police were called. On that day, defendant came to the house and for forty-five minutes "everything was fine" while he visited and took care of the baby. At some point, plaintiff asked defendant if they could modify their informal visitation schedule so that she could go for physical therapy. Initially, defendant agreed, but two

A-0095-21

minutes later "he started yelling" and asking about who would be responsible for watching the baby. When plaintiff identified the individual who would take care of the child as defendant's brother's girlfriend, "he got very angry" and "he started screaming at" her. According to plaintiff, "[defendant] wanted to watch the baby, which made no sense because [her] physical therapies [were] in the day, and he work[ed] full time."

Plaintiff stated that defendant also picked up his child and said to the baby, "your mother[ i]s a fucking cunt." Plaintiff asked him to leave, which he began to do, while continuing to scream at her. However, defendant stopped, calmed himself down, and using his phone's camera, started to follow plaintiff around the house while recording her.

Plaintiff became afraid, called her mother on the phone, and eventually asked her mother to call the police as defendant "was coming at [her]." She did not originally intend to have her mother call the police but while she was on the phone with her, plaintiff became nervous as defendant became extremely aggressive. Plaintiff then went into the bedroom and defendant "pushed into the door to come in, and [she] was very scared."

While she waited for the police to arrive, defendant continued to follow her around the house "getting in [her] face yelling while [she] was just holding

the baby." Plaintiff confirmed that, after she got off the phone with her mother, she also began to record the incident at the same time.

The trial court then viewed the video recording taken by plaintiff. In the recording, defendant was seen and heard arguing with plaintiff and refusing to leave the apartment. Defendant replied claiming that he could "do whatever the fuck [he] want[s]." Evidently, even though he moved out on June 1, defendant believed he had a right to be there because his name was on the lease and he contributed to the rent.

Before the court viewed the next video, it placed on the record its observations of what it already saw. Among its findings, the court stated that "essentially, they're arguing, going back and forth. And there's some self-serving statements, but the [c]ourt does not observe [defendant] trying to attack or physically harm [plaintiff] as she[ i]s claiming in the video."

The next video depicted the argument continuing, but now about who was financially responsible for supporting plaintiff and the child. At that point, the court interjected and placed a finding on the record that while plaintiff was "saying he is yelling, but [the court doesn't] hear him yelling" on the video, "[h]e's just talking." The video then continued.

A-0095-21

After the videos were played, counsel was permitted to conduct direct examination. She asked plaintiff to explain "when was it that [she] felt . . . in danger of [defendant] attacking you?" Plaintiff explained that it was before the video started. And, when he started to record, "he calmed down."

Plaintiff explained she did not seek a restraining order that day because she "was afraid [defendant] was going to flip out, and [she] was afraid he was going to hurt [her], and [she] was afraid for [her] kids." With that, the court interjected again and asked why if she was afraid to get a restraining order on June 14 she was not afraid to do so on June 16. She explained that on June 16, defendant walked into the house using his key that she did not know he still had. According to plaintiff, defendant had told her when he moved out on June 1 that he no longer had a key to the apartment because he had lost it. When he suddenly entered the apartment, he scared her as she was in the house alone with her child and she did not have any earlier conversations or agreement about him coming to the apartment that day.

When plaintiff asked him to leave, defendant told her that she was "about to be homeless," that he "called the police and told them that [she] was toxic and that he wanted [her] to leave," and that "he wanted [her] out of the apartment."

A-0095-21

After defendant called the police, he waited downstairs, where his brother lived, and then outside.

In response to further questioning by the court, plaintiff testified that she was increasingly scared of defendant because it was getting "worse and worse." Plaintiff also testified to past incidents of domestic violence that included defendant pushing "doors into" her, which he did when he got angry. It happened several times before they had the baby, while she was pregnant. She specifically recalled an incident that occurred while she was holding the baby where he pushed the door in after she told defendant that she was holding the baby and that he should just go downstairs.

Plaintiff then described incidents that occurred on May 16, while his family was over. Plaintiff explained that although they had agreed he would be taking care of the baby that night so that she can have an alcoholic beverage, defendant became intoxicated himself.

Later that night when she woke up, she found defendant passed out on the couch. When she went to feed the baby at around 4:00 a.m., he woke up and became "agitated," "he started screaming at [her] . . . telling [her] that [she] stole his wallet." He then began to "fli[p] the whole house," including "all the drawers, [her] pocketbook, all of the baby's stuff that[ was] organized in the

9

corner[, and] the shoe rack." Plaintiff took the baby and stood in the corner of the bedroom while defendant "flipped the whole mattress."

Defendant testified next. The trial court directed him to the May 1 incident. He explained that plaintiff attempted to take the baby and the bottle away from him while he was feeding his child. He then "smack[ed] her hand away from [himself]." According to defendant, plaintiff's fingers broke because he "swatt[ed]" her hand. However, in response to the court's question, defendant confirmed that he was defending himself. He claimed that plaintiff then called her adult daughter and a friend and told them that "she fell instead of what actually happened, which [he] thought was insane."

The court then directed defendant to June 14. According to defendant, he arrived at the apartment as previously agreed with plaintiff. Initially everything was fine. He confirmed he got angry when plaintiff told him that in order for her to go to physical therapy, his brother's girlfriend would be watching the child. He became angry because, in the past, plaintiff refused to allow the same person to care for the child when necessary, but at that moment plaintiff would have let her care for the child alone before letting defendant do the same. According to defendant, he had "every right to be angry," which caused him to start yelling at plaintiff. He confirmed that he looked at his daughter then at

10

plaintiff and stated, "[y]ou're a fucking cunt." According to defendant, he acted in anger because plaintiff took the position that defendant and his girlfriend would "never see [his] child."

Defendant claimed he started to video record the events because he wanted "to protect [himself]" and he heard plaintiff on the phone with her mother saying that he was "attacking her." Defendant stated that he "did not touch her."

The court then viewed defendant's video of the June 14 incident. During the video, defendant yelled at plaintiff that he heard her tell her mother he was attacking her, when he was not, and plaintiff responding by telling defendant that he had to leave the apartment. In response defendant stated the following:

> What the fuck. My daughter. You cannot say my daughter is allowed to go there, not with me because you're a bitter bitch. No, fuck you. Call the cops. Oh, you can't. Exactly. Because they will tell you to find somewhere to go because it's my name on the lease, not you, correct? Yes. Oh, again, I'm still recording this. This is all good. I'll fucking happily record all of it.
>
> . . . .
>
> No. I don't have to [leave]. I don't have to do shit. I can do whatever the fuck I want. Here, there, wherever. What the fuck? What the fuck do you think this is?

The video continued with defendant demanding that plaintiff tell him why he could not take their child, and plaintiff repeatedly asking him to leave. All

A-0095-21

the while, defendant continued to tape their argument, including the moment when plaintiff knocked defendant's cell phone out of his hand. Once the videos were completed, the trial court confirmed with defendant that the basis of his complaint was "essentially . . . she knocked the video out of [his] hand on [June] 14."

The judge then directed defendant to address the incident on June 16. According to defendant, his appearance at the apartment on that date was scheduled to be his parenting time from 5:30 p.m. to 7:00 p.m. Therefore, defendant believed his appearance was not unannounced even though he confirmed again that he used his key to enter without first knocking. He explained he had kept the key to the apartment after he left because his "name [wa]s on the lease and [he did] not feel comfortable if [he was] paying the bills and [his] name is on the lease." Because he believed the apartment was his, he was "100 percent" permitted to enter the apartment whenever he wanted, even though he moved out as of June 1 and was no longer living there.

As to the May 16 incident, defendant confirmed that when he woke-up he "turned the house upside down because [plaintiff] woke [him] up, and [he] wasn't on the couch; [he] was in the bed. She woke up flipping out, saying [he] was a piece of shit father for falling asleep, even though [their] daughter was

12

asleep." Defendant confirmed that he "freak[ed] out" and that he was angry. He believed that plaintiff had taken his wallet.

Defendant went to look for his wallet because he was going to leave. He could not find it. According to defendant, "[e]verything [he] own[ed was] missing, all [his] personal documents, everything, [and he] file[d] a police report for [it] because [he had] multiple things from the government sent to [his] house." He never found his wallet.

Addressing his complaint for an FRO, defendant also testified that he filed it only because he wanted to get plaintiff out of his apartment. It was the police who told him that in order to do so he should get a restraining order. Defendant confirmed that it was "[100] percent" his reason for seeking a restraining order, not because plaintiff attacked him.

After considering the parties closing arguments, the court placed its decision on the record. The court found plaintiff to be "very credible" about her description of what had occurred on May 1. It rejected defendant's contention that he merely swatted away plaintiff's hand and instead found plaintiff's version of how her fingers were broken to be "truthful." The court noted in support of its finding that defendant never said he was being attacked by plaintiff so there was no justification for the injury he caused to plaintiff. As a result, the court

concluded that defendant committed the predicate act of assault. However, it also found that plaintiff was out of control, but that did not justify defendant injuring her in the way that he did.

Turning to the June 14 incident, the court rejected defendant's contention that he had a right to come to the apartment because he was paying the rent. The court also found defendant's contention that he was following plaintiff around the apartment filming her to show that he was not attacking her was "problematic." According to the court, defendant followed plaintiff around "yelling[ and] cussing," while plaintiff asked that he stop and leave, which defendant did not do. Instead, the situation escalated as defendant followed plaintiff with his camera. The court found that plaintiff was "absolutely upset," but that her statements about going to be hurt were "self-serving." It concluded that under the circumstances, defendant committed the predicate act of harassment by causing communication that was likely to cause annoyance or alarm and by engaging in "alarming conduct, with the purpose to cause serious annoyance or alarm." The court explained that defendant should have "just stopped."

14

The court also found that on June 14 plaintiff committed the predicate act of criminal mischief by swatting at defendant's phone, knocking it out of his hand, and causing the phone screen to be cracked.

Turning to June 16, the court accepted defendant's assertion that he was scheduled to be there on that date to see his child but rejected his contention that he had the right to enter the apartment because he was paying the rent. The court specifically stated to defendant "you don't have the right to enter without permission." By entering without permission using his key, the court concluded that defendant committed the act of harassment by causing "annoyance or alarm."

Addressing the May 16 incident, the court again accepted defendant's testimony that his wallet and other property was missing. It concluded that his turning "the house upside down" was not harassment or criminal mischief. The court also concluded that defendant's intent was not to harass but to find his property. Moreover, there was no criminal mischief because there was no "destruction of property."

Having found that both parties committed predicate acts, the court turned to the second part of the analysis concerning "whether or not [an FRO] is necessary." The court found that it was "not convinced that there[ was] really a

15

domestic violence history." The court relied upon the fact that plaintiff could not specify dates when defendant allegedly committed prior acts of domestic violence and that plaintiff testified there was no physical violence between her and defendant, just emotional violence as indicated in her complaint.

After considering whether there was a history of domestic violence, the court then determined an FRO was not necessary for the protection of either party. The court stated the following:

> I find that there is some emotional water under this that needs to be dealt with, but what really needs to happen between the two of you, because the arguments that you both have, as I look at it, is really about parenting time, about whether or not you have this access to your child when and where you want. And that can't be the case.

The court directed that the parties attempt to come up with a parenting time schedule and to make sure it was not conducted at the apartment. According to the court, "a lot of this [was] really insignificant, it really [was], except for the breaking of the fingers, and, however, [it did not] find [defendant was] exclusively at fault for this."

The court recognized that plaintiff had been trying to take the baby from defendant and that plaintiff became "emotional[] and things spiral[ed] out of control," [but] "[g]rabbing the fingers bringing them back wasn't the answer to

16

that stuff." It stated it could "certainly understand how that happened. But d[id] it justify a defense? No."

On the same day, the court entered an order dismissing the plaintiff's complaint and the previously entered TRO. Plaintiff's counsel requested a stay pending appeal, which the court rejected because it could not find any "justification for it." On August 20, 2021, the court entered an additional order denying the stay.[3] This appeal followed.

## II.

On appeal, plaintiff argues that the entry of an FRO should have been "perfunctory and self-evident" in light of the injuries the court found defendant inflicted on plaintiff. Moreover, she contends the trial court improperly relied upon the parties' lack of a history of domestic violence to support the denial of an FRO. Finally, plaintiff asserts that the trial court failed to consider all of the statutory factors set forth in N.J.S.A. 2C:25-29(a)(1) to (6). According to plaintiff, under those factors, an FRO was warranted. We agree.

Our scope of review of an FRO is limited. See C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). "We accord 'great deference to discretionary

---

[3] Plaintiff did not file a motion with the Appellate Division seeking a stay pending appeal.

decisions of Family Part judges'" given "the 'family courts' special jurisdiction and expertise in family matters.'" G.M. v. C.V., 453 N.J. Super. 1, 11 (App. Div. 2018) (first quoting Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012); and then quoting N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010)).

When reviewing "a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013). We will "not disturb the 'factual findings . . . of the trial [court] unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). Deference is particularly appropriate when the evidence is testimonial and involves credibility issues because the trial court who observes the witnesses and hears the testimony has a perspective that the reviewing court does not enjoy. Cesare, 154 N.J. at 412.

"On the other hand, where our review addresses questions of law, a 'trial [court's] findings are not entitled to that same degree of deference if they are based upon a misunderstanding of the applicable legal principles.'" R.G. v.

A-0095-21

R.G., 449 N.J. Super. 208, 218 (App. Div. 2017) (quoting N.T.B. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015)).  We do not accord deference to legal conclusions and review such conclusions de novo.  Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

Applying our deferential standard of review, we conclude the trial court misapplied the applicable law when it determined that a FRO was not required under the facts it found.

A court's decision in a domestic violence action must be guided by the policy behind the PDVA.  The Act was passed to further New Jersey's "strong policy against domestic violence."  N.T.B., 442 N.J. Super. at 216 (quoting Cesare, 154 N.J. at 400).  The purpose of the PDVA is to "assure the victims of domestic violence the maximum protection from abuse the law can provide." G.M., 453 N.J. Super. at 12 (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007)); see also N.J.S.A. 2C:25-18; State v. Hoffman, 149 N.J. 564, 584 (1997).  Consequently, "[o]ur law is particularly solicitous of victims of domestic violence," J.D. v. M.D.F., 207 N.J. 458, 473 (2011) (alteration in original) (quoting Hoffman, 149 N.J. at 584), and courts will "liberally construe[] [the PDVA] to achieve its salutary purposes."  Cesare, 154 N.J. at 400.

A-0095-21

To determine whether the entry of an FRO is appropriate, the trial court must first "determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Silver, 387 N.J. Super. at 125. If the court finds a defendant committed a predicate act of domestic violence, then the second inquiry "is whether the court should enter a restraining order that provides protection for the victim." Id. at 126; see also J.D., 207 N.J. at 475-76 (explaining that an FRO should not be issued without a finding that relief is "necessary to prevent further abuse" (quoting N.J.S.A. 2C:25-29(b))). This "second prong set forth in Silver requires [that] the conduct [be] imbued by a desire to abuse or control the victim." R.G., 449 N.J. Super. at 228 (emphasis added); see also Peranio v. Peranio, 280 N.J. Super. 47, 52 (App. Div. 1995) (defining domestic violence as "a pattern of abusive and controlling behavior injurious to its victims"). Whether a defendant's conduct was designed to abuse or control the plaintiff should be assessed in the context of the "entire relationship between the parties." Cesare, 154 N.J. at 405.

The PDVA "defines domestic violence by referring to a list of predicate acts . . . found within the New Jersey" Criminal Code. J.D., 207 N.J. at 473. "[T]he commission of a predicate act . . . constitutes domestic violence . . . ."

Ibid.   Here, the trial court found that defendant committed the delineated predicate acts of assault and harassment.   We agree that those findings were amply supported by the record.

However, "[c]ommission of a predicate act is necessary, but alone insufficient, to trigger relief provided by the [PDVA]."  R.G., 449 N.J. Super. at 228.  Once it made that determination, the trial court was required to consider, under the factors enumerated in N.J.S.A. 2C:25-29(a)(1) to (6), whether an FRO was necessary "to protect [plaintiff] from an immediate danger or to prevent further abuse."  Silver, 387 N.J. Super. at 127; see also A.M.C. v. P.B., 447 N.J. Super. 402, 414 (App. Div. 2016).

Those factors include, but are not limited to, the following:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;
>
> (5) In determining custody and parenting time the protection of the victim's safety; and

(6) The existence of a verifiable order of protection from another jurisdiction.

[N.J.S.A. 2C:25-29.]

The court may also look to other relevant factors not included in the statute. See N.T.B., 442 N.J. Super. at 223. In reaching the determination that a restraining order is necessary, a trial court must "exercise [care] to distinguish between ordinary disputes and disagreements between family members and those acts that cross the line into domestic violence." R.G., 449 N.J. Super. at 225, 229-30 (citing J.D., 207 N.J. at 475-76) (reversing order granting FRO despite finding defendant's acts of vulgar name-calling and assault by repeatedly shoving plaintiff to the ground were "unacceptable and repugnant" because that did not support a finding that a final restraining order was necessary for plaintiff's immediate protection or to prevent further abuse).

When deciding whether an FRO is necessary to ensure protection in the future, in some cases, "the risk of harm is so great" that the determination of whether a restraining order should be issued is "perfunctory and self-evident." J.D., 207 N.J. at 475-76, 488. For example, "[w]hen the predicate act is an offense that inherently involves the use of physical force and violence, the decision to issue an FRO 'is most often perfunctory and self-evident.'" A.M.C., 447 N.J. Super. at 417 (quoting Silver, 387 N.J. Super. at 127).

22

Other cases, however, require an in-depth analysis to determine whether "relief is necessary to prevent further abuse." J.D., 207 N.J. at 476 (reversing order granting FRO where defendant harassed plaintiff because the risk of harm was not so great that the inquiry whether an FRO is necessary would have been perfunctory and remanding for the trial court to articulate its findings and conclusions as to this inquiry); see also R.G., 449 N.J. Super. at 228.

As noted, among the factors to be considered is the parties' previous history of abuse. Cesare, 154 N.J. at 401-02.

> The law mandates that acts claimed by a plaintiff to be domestic violence must be evaluated in light of the previous history of domestic violence between the plaintiff and defendant including previous threats, harassment and physical abuse and in light of whether immediate danger to the person or property is present. This requirement reflects the reality that domestic violence is ordinarily more than an isolated aberrant act and incorporates the legislative intent to provide a vehicle to protect victims whose safety is threatened. This is the backdrop on which [a] defendant's acts must be evaluated.
>
> [R.G., 449 N.J. Super. at 228-29 (quoting Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995)).]

However, a prior history of domestic violence is not always required to support a court's determination because "the need for an order of protection upon the commission of a predicate act of 'domestic violence' . . . may arise even in

23

the absence of such [a history] where there is 'one sufficiently egregious action.'" Silver, 387 N.J. Super. at 128 (quoting Cesare, 154 N.J. at 402).

Also, nothing in the PDVA precludes a finding that an FRO is necessary to prevent future abuse absent an explicit expression that the plaintiff lived in fear of the perpetrator. Notably, "whether the victim fears the defendant" is one of eleven non-exclusive factors the trial court considers upon an application to modify or dissolve an existing FRO. G.M., 453 N.J. Super. at 13. That said, even in that context, although important, whether the plaintiff fears the defendant is only one factor in—not the end of—the court's analysis. Ibid.

Here, we conclude from the trial court's findings of facts that, consistent with the policy behind the PDVA, an FRO was warranted. The trial court overlooked the significance of "the inherently violent nature," see A.M.C., 447 N.J. Super. at 405, of defendant breaking plaintiff's bones when it determined that an FRO was not warranted. Moreover, it mistakenly determined that it could not issue an FRO because it could not find any past acts of domestic violence, despite plaintiff's testimony to the contrary, and her testimony about her fear of defendant. In addition, it only considered the first statutory factor without articulating anything about factors two, four and five, which were applicable to this matter.

24

Defendant's conduct, as found by the trial court, demonstrated defendant's continuing belief that he could control plaintiff through harassment and physical abuse, which he employed in an attempt to force her to comply with his demands about when and where he could see the parties' child, or what third parties could have contact with her. If defendant legitimately believed that plaintiff's actions were not in his child's best interest or violated his rights as a parent, or if he mistakenly believed he had a right to unlimited access of his former residence, he could have left the apartment when he was confronted by plaintiff and sought judicial intervention in the Family Part or another appropriate court. Instead, he obviously engaged in behavior that was designed to harm and intimidate plaintiff, exactly the type of conduct the PDVA was meant to prevent.

Applying the policy behind the PDVA and the applicable statutory factors, we are convinced that an FRO should have been entered for the continued protection of the plaintiff.

We therefore vacate the order dismissing plaintiff's complaint and remand for entry of an FRO under such conditions determined by the trial court in its discretion.

A-0095-21

III.

Finally, we would be remiss if we did not comment on the trial court's unwarranted and unsolicited advice given to plaintiff and her attorney about the value of seeking an appeal of the trial court's determination. Specifically, in response to plaintiff's request for a stay, the court weighed in on its thoughts about the value of appealing its decision and went as far as to warn plaintiff that, if the matter was remanded, she too could become the object of an FRO in defendant's favor, and that her actions would necessarily prevent defendant from being a father to their child.

In relevant part, the court stated as follows:

> You can have the Appellate Division do that. Because let me tell you what has happened in these cases -- and mom needs to know this before you file the appeal -- whenever there's an (indiscernible) that's happened, and there's an appeal filed, one of the things that I get upset with the Appellate Division is it takes too long; it takes months, absolute months. And it's not fair to the other parent who is waiting for the Appellate Division. And I don't think it's fair in the scheme of things; it's just not right. It will take months, and he will not see this child while that is pending.
>
> So I'm going to ask you to rethink that and talk to your client to come up with something. . . . .
>
> If the Appellate Division was quick, I wouldn't have a problem with the Appellate Division, but they take too long. I've had cases when it's been six months.

26

It's just not right. And I hear you; you got the right to do it, and -- listen, do what you got to do. But I want you to also think about the consequences of that. If, in fact, she really wants him to be in the life as a father because it's a really long time. And I'm being generous when I say six months. I'm being generous.

And here's the other thing. Let me just say this to you. I found that there was a predicated act established on both sides. Okay. If you come back to me, right, the Appellate Division, I found that the predicate act -- the restraining order would be on both sides. You're still going to get to a parenting schedule.

So the question becomes the strategy: What are you doing? If the intent is to stop him from being a father, then go ahead and file it. But if the intent is that I really need the protection, play it all the way through. I found there was a predicated on both sides. So you got to play it all the way out.

My question is: What should really be happening here. And what really should be happening, in my view, is coming up with the appropriate schedule. They're done. They're split. That's done. But . . . we do more harm than good when we haven't thought it all the way through because it can come back and -- hey, don't forget I found a predicated act on both sides.

So give it some thought.

The court's lecture in this regard was inappropriate and overstepped the division between the bench and the bar. It is not the court's function to render unsolicited advice about whether a litigant should appeal, a litigant's lawyer is charged with that responsibility. Moreover, to advise a litigant that if the matter

27

is remanded, the dismissal of the claim against her might be revisited, even though there was no present basis for entry of that order, is beyond the limits of proper conduct by a trial court, no matter how well intentioned it might be.

To say the least, the comments here were not only manipulative but demonstrated a lack of understanding as to how our court operates and the various relief available to a litigant who is not satisfied, as here, with a trial court's attempt to comply with the applicable law. We hope that the trial court here thinks twice before injecting itself again, without invitation, into an attorney's relationship with her client and giving advice to litigants in the future or expressing its dissatisfaction with how our appellate court operates.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0095-21